Exhibit 3: Operating Agreement

# OPERATING AGREEMENT

**THIS OPERATING AGREEMENT** is made effective by the undersigned as of this 19 day of ~~December~~, 201~~5~~6. *MK*
January

## I. FORMATION

1.1 The undersigned have formed a limited liability company under the laws of the State of New York by filing on December 3, 2015 articles of organization with the Secretary of State of New York.

1.2 The name of this Company is **Green Group 11 LLC**.

1.3 The purpose for which this Company is formed to purchase and manage the premises located at **220 and 850 Greene Avenue, Brooklyn, New York** (the "Premises") and to engage in any lawful act, business or activity for which limited liability companies may be formed under the laws of the State of New York and to do any and all other things determined by the Managers to be necessary, desirable or incidental to the foregoing purpose.

1.4 The term of the Company shall become effective on the date the articles of organization are filed with the Secretary of State of New York, and shall continue for a period of one hundred (100) years from the date hereof, unless the Company is dissolved earlier pursuant to the provisions of this Agreement or as provided in the Statutes of the State of New York.

1.5 The location of the principal place of business of the Company is 1202 Halsey Street, Brooklyn, New York. The Managers may change the principal place of business and establish additional places of business as they deem necessary or desirable to conduct the business of the Company.

1.6 The Company's agent for service of process shall be Michael Kandhorov, who is located at the following address: 1202 Halsey Street Brooklyn, New York 11207, or such other agent as the Managers may designate from time to time.

1.7 The capital contributions of the members are as follows:

Michael Kandhorov- $100,000 (reserved solely for the purchase of the 220 and 850 Greene Avenue)

Charles Zizi- cooperation, assistance, and aid ("sweat equity")

## II. MANAGEMENT

2.1 The Manager is Michael Kandhorov. He and all subsequent Managers shall be Members and shall be solely responsible for the management of the Company's day to day business. He shall possess all rights and powers generally conferred by law and all rights and powers that are necessary, advisable or consistent in connection therewith and with the provisions of this Agreement. A majority vote of the Managers shall bind all of the Managers with respect to any major decisions. The Managers shall also be vested with all specific rights and powers required for or appropriate to the management, conduct or operation of the business of the Company. Except for distributions made to Members as set forth in this Agreement and any fees

1

for specific management services, the Managers shall receive no compensation from the Company for their actions taken as Managers pursuant to this Agreement.

2.2   The Managers shall serve as such until resignation, death or a judicial adjudication of incompetency, or until the remaining Managers select a new Manager, or if a new Manager is not chosen, until the aggregate of members holding Seventy Percent (70%) of the equity interest in the Company (as shown on Exhibit A) elect a new Manager or Managers at a meeting called by the Members or Managers for such a purpose

2.3   Rights and powers of the Managers, by way of illustration but not by way of limitation, and in which event the approval must be obtained by a majority of the managers and shall include the right and power to:

(A)   Authorize or approve all actions with respect to distribution of funds and assets in kind of the Company; acquire, secure or dispose of investments, including, without limitation, selling and otherwise disposing of assets of the Company, borrowing funds, executing contracts, bonds, guarantees, notes, security agreements, mortgages and all other instruments to effect the purposes of this Agreement; and execute any and all other instruments and perform any acts determined to be necessary or advisable to carry out the intentions and purposes of the Company.

(B)   Subject to the limitations imposed by this Agreement, admit additional Members in substitution of Members disposing of their interest in the Company.

(C)   Perform any and all acts necessary to pay any and all organizational expenses incurred in the creation of the Company and in raising additional capital, including, without limitation, reasonable brokers' and underwriters' commissions, legal and accounting fees, license and franchise fees (it being understood that all expenses incurred in the creation of the Company and the commencement of the Company business shall be borne by the Company); and compromise, arbitrate or otherwise adjust claims in favor of or against the Company and to commence or defend against litigation with respect to the Company or any assets of the Company as deemed advisable, all or any of the above matters being at the expense of the Company; and to execute, acknowledge and deliver any and all instruments to effect any and all of the foregoing.

(D)   Purchase goods or services from any corporation or other form of business enterprise, whether or not such corporation or business enterprise is owned or controlled by, or affiliated with, the Managers or Members, including management services at the usual and customary rates prevailing in the management industry from time to time for similar services.

(E)   Establish Company offices at such other places as may be appropriate, hire Company employees and consultants, engage counsel and otherwise arrange for the facilities and personnel necessary to carry out the purposes and business of the Company, the cost and expense thereof and incidental thereto to be borne by the Company.

2.4   The Managers shall manage or cause to be managed the affairs of the Company in a prudent and businesslike manner and shall devote such time to the Company affairs as they shall, in their discretion exercised in good faith, determine is reasonably necessary for the conduct of such affairs; provided, however, that it is expressly understood and agreed that the Managers shall not be required to devote their entire time or attention to the business of the Company. In carrying out their obligations, the Managers shall:

(A)   Obtain and maintain such public liability, hazard and other insurance as

may be deemed necessary or appropriate by the Managers, but in any event in an amount sufficient to replace the building(s), together with improvements, and personal property comprising part of the Company's assets.

(B) Deposit all funds of the Company in one or more separate bank accounts, using such banks or trust companies as the Managers may designate (withdrawals from such bank accounts to be made upon such signature or signatures as the Managers may designate).

(C) Maintain complete and accurate records of all properties owned or leased by the Company and complete and accurate books of account (containing such information as shall be necessary to record allocations and distributions), and make such records and books of account available for inspection and audit by any Member or his duly authorized representative (at the expense of such Member) during the regular business hours and at the principal office of the Company.

(D) Prepare and distribute to all Members tax reporting information.

(E) Notify all Members of receipt of any notice of default from any lender, within ten (10) days after receipt of such notice.

(F) Cause to be filed such certificates and do such other acts as may be required by law to qualify and maintain the Company as a limited liability company under all applicable state laws.

(G) Maintain a list, in alphabetical order, of all current Members and past Members, together with the mailing address of each Member.

(H) Maintain copies of the Articles of Organization, any amendments thereto and powers of attorney, if any, pursuant to which the execution of the Articles of Organization have occurred.

(I) Maintain copies of present and past documents relating to the operation and business of the Company.

(J) Finance all of the litigious and all other matters (legal or not) of the company using solely their personal finances, but which the Company shall reimburse either after the sale of either one of the properties or at the time of dissolution.

2.5 In carrying out their duties hereunder, the Managers shall not be liable to the Company nor to any Member for their good faith actions or failure to act, nor for any errors of judgment, nor for any act or omission believed in good faith to be within the scope of authority conferred by this Agreement, but only for their own willful or fraudulent misconduct in the performance of their obligations under this Agreement, or for gross negligence or willful breach of their fiduciary duties under this Agreement. The receipt of advice of counsel that certain acts and omissions are within the scope of authority conferred by this Agreement shall be conclusive evidence of good faith; however, good faith may be determined without obtaining such legal advice.

The Company does hereby indemnify and hold harmless the Managers and their agents, officers and employees as to third parties against and from any personal loss, liability or damages suffered as a result of any act or omission which the Managers believed, in good faith, to be within the scope of authority conferred by this Agreement, except for willful or fraudulent misconduct, gross negligence or willful breach of fiduciary duties, but not in excess of the capital contributions of all Members. Notwithstanding the foregoing, the Company's indemnification of the Managers

and their agents, officers and employees as to a third party is only with respect to such loss, liability or damage which is not otherwise compensated for by insurance carried for the benefit of the Company. Insurance coverage for public liability, and all other insurance deemed necessary or appropriate by the Managers to the business of the Company, shall be carried in such amounts and of such types as shall be determined by the Managers, subject to Article 2.4(A).

    2.6    No financial institution or any other person, firm or corporation dealing with the Managers shall be required to ascertain whether the Managers are acting in accordance with this Agreement, but such financial institution or such other person, firm or corporation shall be protected in relying upon the deed, transfer or assurance of, and the execution of such instrument or instruments by, the Managers.

    2.7    The Members hereby acknowledge that the Managers may, from time to time, engage in business enterprises similar to the business of the Company and competitive with the business of the Company. The Managers may engage in such similar and competitive enterprises without restriction and have no obligation to account to the Company nor to the members for such activities.

### III.  MEMBERS

    3.1    The Members are listed on Exhibit A, which is attached hereto and made a part hereof. Exhibit A shall reflect the Pro Rata interests of each Member, as determined by, cash contributed, the value of property contributed and/or the value of services contributed, and each Member's percentage ownership of the Company.

    3.2    Except as otherwise specifically provided in this Agreement to the contrary, no Member shall have the right:

    (A)    To take part in the control of the Company business or to sign for or to bind the Company, such power being vested in the Managers.

    (B)    To have his capital contribution repaid except to the extent provided in this Agreement.

    (C)    To require partition of the Company's property or to compel any sale or appraisal of the Company's assets.

    (D)    To sell or assign his interest in the Company or to constitute the vendee or assignee thereunder, except as provided in this Agreement.

    (E)    To voluntarily withdraw as a Member from the Company.

    3.3    No member shall be personally held accountable for any of the debts, losses, claims, judgments or any of the liabilities of the Company beyond the Member's contributions to the capital of the Company, except as provided by law.

### IV.  MEETINGS OF MEMBERS

    4.1    *Annual Meeting.* The annual meeting of the Members of the Company, for the consideration of reports to be laid before such meeting and for the transaction of such other business as may properly be brought before such meeting, shall be held at the principal office of

the Company in the City of New York in Brooklyn County, State of New York, as may be designated by the Managers and specified in the notice of such meeting. Each such meeting shall be held on the last Tuesday of each September, if not a legal holiday, and, if a legal holiday, then on the next succeeding business day.

    4.2    *Special Meetings.* Special meetings of the Members of the Company may be held on any day, when called by the Mangers, or by the Members who hold at least thirty percent (30%) of the equity of the Company (as shown on Exhibit A). Upon written request delivered either in person or by certified mail, return receipt requested, to the Managers by any Members entitled to call a meeting of Members, such Managers shall forthwith cause notice to be given to the Members entitled to such notice. The meeting must be held on a date not less than ten (10) nor more than sixty (60) days after the receipt of such request, as the Managers or Members may fix. If such notice is not given within twenty (20) days after the delivery or mailing of such request, the person or persons calling the meeting may fix the time of the meeting and give notice thereof in the manner provided for by law or this Agreement, or cause such notice to be given by any designated representative. Each special meeting shall be called to convene between 8:00 a.m. and 6:00 p.m., and shall be held at the principal office of the Company.

    4.3    *Notice of Meetings.* Not less than ten (10) nor more than sixty (60) days before the dated fixed for a meeting, written notice stating the time and place of the meeting (and, in the case of a special meeting, the purposes of such meeting) shall be given.

The notice shall be sent by personal delivery or by certified mail, return receipt requested, to each Member entitled to notice of the meeting who is a Member of record as of the day preceding the day on which notice is given, or, if a record date is duly fixed, as of that date. If mailed, the notice shall be addressed to the members at their respective addresses as they appear in the records of the Company.

    4.4    *Quorum; Adjournment.* Except as may otherwise be provided by law, the Articles of Organization or this Operating Agreement, at any meeting of the Members, the holders of a majority of the capital of the Company, either present in person or by proxy, shall constitute a quorum for such meeting.

    4.5    *Proxies.* Members entitled to vote may vote in person or by proxy. The person appointed as proxy need not be a Member. Unless the writing appointing a proxy otherwise provides, the presence at a meeting of the person who appointed a proxy shall not operate to revoke the appointment. Notice to the Company, in writing or in open meeting, of the revocation of the appointment of a proxy shall not affect any vote or action previously taken or authorized.

    4.6    All votes of Members shall be in accordance with their then existing percentage of capital of the Company.

## V.    PROFITS, LOSSES AND ACCOUNTING

    5.1    *Allocation of profits and losses:*

    (A)    Except as otherwise provided herein, net profits and losses of the Company (including profits and losses attributable to the sale, refinance or other disposition of all or any portion of the Company's property) shall be first allocated among or borne by the Members to reduce the balance of Members Initial Capital contribution by one hundred percent. All net profits and losses above the Members initial Capital contribution shall be allocated in the percentages listed in Exhibit A, which is attached hereto and made a part

hereof, or in accordance with their equity interest in the Company, as those may change as provided herein.

(B) Notwithstanding any provision of this Agreement to the contrary, to the extent required by law, income, gain, loss and deduction attributable to property contributed to the Company by a Member shall be allocated among the Members so as to take into account any variation between the tax basis of the property and the fair market value thereof at the time of contribution, in accordance with the requirements of Section 704(c) of the Internal Revenue Code of 1986 (the "Code"), as amended, or its counterpart in any subsequently-enacted Internal Revenue Code, and the applicable Treasury Regulations (the "Regulations") thereunder.

(C) Company profits, losses and gains shall be allocated to the Members in accordance with the portion of the year during which the Members have held their respective interests. All items of income and loss shall be considered to have been earned ratably over the fiscal year of the Company, except that gains and losses arising from the disposition of assets shall be taken into account as of the date thereof.

(D) Notwithstanding any provision of this Agreement to the contrary, in the event the Company is entitled to a deduction for imputed interest under any provision of the Code on any loan or advance from a Member, such deduction shall be allocated solely to such Member.

(E) Notwithstanding any provision of this Agreement to the contrary, to the extent the payment of any expenditure by the Company is treated as a distribution to a Member for federal income tax purposes, there shall be a gross income allocation to such Member in the amount of such distribution.

(F) Notwithstanding any provision of this Agreement to the contrary, if items of income or gain to be allocated include income or gain treated as ordinary income for federal income tax purposes because they are attributable to the recapture of depreciation under Section 1245 or 1250 of the Code, then such income or gain, to the extent treated as ordinary income, shall be allocated to, and reported by, the Members in proportion to their then respective cumulative allocation of depreciation.

(G) Nothwithstanding any provision of this Agreement to the contrary, all members other than the managers shall have a distribution preference in 100% of all distributions made by the Company, including distributions made pursuant to Article VIII hereof, until such members have received a distribution in an amount equal to an interest rate of ten percent (10%) on the current balance of their initial capital contributions. This distribution preference shall terminate on the seventh anniversary of the date hereof.

5.2 *Accounting:*

(A) The Company books shall be kept on the accrual basis and in accordance with reasonable accounting principles consistently applied.

(B) The fiscal year of the Company shall end on December 31.

(C) The terms "net profits" and "net losses," as used herein, shall mean the net amount of the Company's profits and losses, as determined for federal income tax purposes, and shall also include each Member's share of income described in Section 705(a)(1)(B) of the Code, any expenditures described in Section 705(a)(2)(B) of the Code, any expenditures described in Section 709(a) of the Code which are not deducted or amortized in accordance with Section 709(b) of the Code, basis adjustments required

pursuant to former Section 48(q) of the Code, and losses not deductible pursuant to Section 267(a) or 707(b) of the Code.

5.3   *Member's Capital Accounts:*

(A)   There shall be maintained a capital account for each Member in accordance with this Article 5.3. The amount of each Member's contribution of cash, property and/or services to the capital of the Company shall be credited to such Member's capital account. From time to time, but not less often than quarterly, each Member's share of profits, losses and distributions shall be credited or charged, as the case may be, to such Member's capital account. The determination of a Member's capital account, and any adjustments thereto, shall be made in a manner consistent with tax accounting and other principles set forth in Section 704 of the Code and applicable Regulations thereunder.

(B)   If, at any time, the Company shall suffer a loss as a result of which the capital account of any Member shall be a negative amount, such loss shall be carried as a charge against that Member's capital account, and that Member's share of subsequent profits of the Company shall be applied to erase such capital account deficit.

(C)   Immediately following the transfer of any interest in the Company, the capital account of the transferee-Member shall be equal to the capital account of the transferor-Member attributable to the transferred interest.

(D)   For the purposes of computing the amount of any item of income, gain, deduction or loss to be reflected in the Member's capital account, the determination, recognition and classification of any such item shall be the same as its determination, recognition and classification for federal income tax purposes, taking into account any adjustments required pursuant to Section 704 of the Code and the applicable Regulations thereunder.

## VI.   TRANSFER OF MEMBER'S INTEREST

6.1   Should a Member desire to sell, assign or exchange all or any part of his interest in the Company to any person seeking to become a substituted Member (or, in the event of a transfer for no consideration, such as gift or bequest), such Member (hereinafter "assignor") who desires to assign all or any part of his interest in the Company shall have the right to transfer to another the whole or any part of such interest, except as set forth in this Agreement.

6.2   If the Member desires to sell or assign all or a portion of his interest in the Company, as set forth in Article 6.1, he shall first confirm offer the same, in writing, for fair market value to the Members, who shall have thirty (30) days after receipt of such offer to accept or reject the offer. If more than one Member accepts such offer, the interest being offered shall be allocated among the accepting Members in proportion to the size of their respective capital accounts.

If the offer is rejected, in whole or in part, then the Members shall sell the Premises for fair market value.

6.3   No assignment of any Member's interest in compliance with this Article VI, even if it results in the substitution of the assignee as a Member herein, shall release the assignor from those liabilities to the Company which survive such assignment.

6.4     Any assignment by a Member of all or any part of his interest in the Company shall be subject to the following:

(A)     The assignment instrument shall be in form and substance satisfactory to the Managers. Among the reasons for which consent may be withheld by the Managers is that they have determined, in their sole discretion, that such substitution may: (i) have an adverse effect on the legal status of the Company under state or federal law or both; or (ii) have an adverse effect on the company in the transfer under state or federal law or both. The request for consent to sales or assignments shall contain a copy of all instruments and documents to be utilized in the transfer and shall be made by certified or registered mail, return receipt requested, sent to the Managers at least sixty (60) days prior to the proposed date of transfer. Any additional information requested by the Managers, including any information relative to the assignee, shall be promptly furnished by the requesting assignor, and no decision need be reached by the Managers until such information is furnished.

(B)     The assignee shall have submitted his written acceptance and adoption of all the terms and provisions of this Agreement, including any and all amendments to this Agreement to be made subsequent to the assignment.

(C)     The assignor shall have paid, or obligated himself to pay, as the Company may determine, all reasonable expenses connected with such transfer, including, but not limited to, the cost of preparing and filing any amendment to this Agreement necessary to effectuate the transfer.

6.5     No Member's interest in the Company has been registered under the *Securities Act of 1933*, as amended (the "Act"). Notwithstanding any other provisions in this Agreement, no Member's interest may be offered for sale, sold, transferred or otherwise disposed of unless:

(A)     such interest is registered under the Act;

(B)     at the expense of the transferring Member, the Company receives an opinion of counsel letter, satisfactory to the Company, to the effect that such transfer is exempt from registration under the Act and is in compliance with all applicable federal securities laws and regulations; or

(C)     the Company receives a "no-action" letter from the staff of the Securities and Exchange Commission ("SEC"), satisfactory to the Company, to the effect that the transfer is exempt from registration.

## VII.    DISSOLUTION AND TERMINATION

7.1     Upon the occurrence of the following events, the Company shall be dissolved:

(A)     the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or any other occurrence which terminates a Member's membership in the Company, except where the Members, other than the effected Member, obtain a majority to continue the business of the Company;

(B)     the term of the Company expires;

(C)     the Managers sell or transfer substantially all of the assets of the Company;

(D)     the Company ceases its business operations; or

(E)     the Members unanimously vote to dissolve and terminate the Company.

7.2    Upon the death or incompetency of a Member, and in the event the Members continue the business under Article 7.1(A), the Member's personal representative, executor or administrator shall have all of the rights of a Member for the purpose of managing or settling his estate, as well as such power as the decedent or incompetent possessed to designate an assignee of his interest in the Company and to join with such assignee in following the procedures contained in this Agreement so that the assignee may become a Member.

7.3    In the event of the dissolution of the Company, the business and affairs of the Company shall continue to be governed by this Agreement during the winding up of the Company's business and affairs.

## VIII. LIQUIDATION

8.1    Upon the dissolution and/or termination of the Company, the Managers shall proceed with the liquidation of the Company and sale of its assets. The proceeds of such liquidation shall be applied and distributed in the following order or priority:

   (A)    to the payment of the debts and liabilities of the Company (other than any loans or advances that may have been made by the Members to the Company, which shall take precedence over the company's' debts and liabilities) and expenses of liquidation;

   (B)    to the payment of any loans or advances made to or for the benefit of the Company by a Member, or for any compensation owed to any of the Managers, but if the amount available for repayment shall be insufficient, then the amount available shall be distributed among the applicable Members through the use of a fraction whose numerator is the amount owed to a single member and whose denominator is the total amount owed to all members (thus, for example, if Member A were owed $2,000 and Member B were owed $1,000, and the amount available to compensate them was $600, then Member A would receive $400 (2/3 of $600) and Member B would receive $200 (1/3 of $600));

   (C)    to the setting up of any reserves which the Managers may deem reasonably necessary in order to meet any contingent or unforeseen liabilities or obligations of the Company arising out of, or in connection with, the business of the Company. Said reserves shall be paid over by the Managers to any financial institution, as escrow agent, with trust authority in the county in which the principal accounting records of the Company have been maintained in order to be held by it for the purpose of disbursing such reserves in payment of any of the aforementioned contingencies or liabilities; and at the expiration of such period as the Managers shall deem advisable, the financial institution shall distribute the balance remaining in the manner provided in this Article 8.1 and in the order named above; and

   (D)    to the payment of the balance, if any, of the respective capital accounts of the Members, if any, subject however, to the distribution preferences established pursuant to Article 5.1(G) hereof.

8.2    When all of the acts provided for in Article 8.1 have been accomplished, the Managers shall file such Articles of Dissolution and any other certificate required in the State of New York and in any other state that may be required by law.

## IX. AMENDMENT OF THE AGREEMENT

9.1     This Agreement may be amended by the Managers without the approval of the Members, provided that such amendment is:

    (A)     solely for the purpose of clarification and does not change the substance hereof;

    (B)     for the purpose of substituting a Member in accordance with the provisions of this Agreement;

    (C)     merely an implementation of the terms of this Agreement; or

    (D)     in the opinion of counsel for the Company, necessary or appropriate to satisfy current requirements of the Internal Revenue Code of 1986, as amended, with respect to limited liability companies, or any federal or state securities laws or regulations.

Any amendment made pursuant to (A) or (C) may be made effective as of the date of this Agreement. All Members shall be notified as to the substance of any such amendment to this Agreement and, upon request, shall be furnished a copy thereof.

9.2     All other amendments to this Agreement shall require the approval of Members holding at least seventy percent (70%) of the equity in the Company (as shown in Exhibit A).

## X.     NON-DISCLOSURE

10.2     The parties agree to perform their obligations under this agreement in secrecy. They further agree that during the life of this agreement and through and including the conveyance of the premises the

    10.2.1     use of any confidential information for personal pecuniary gain of any sort directly or indirectly other than for or on behalf and benefit of this agreement and in furtherance of the terms of this agreement is strictly prohibited and

    10.2.2     disclosing to any person or entity any confidential information other than for or on behalf and benefit of this agreement and in furtherance of the terms of this agreement is strictly prohibited.

10.2.3 Confidential Information. "Confidential Information" shall mean and include any and all Information regarding the premises, this transaction, this agreement, any lawsuits relating to the premises or this agreement, and any oral, written, and electronic messages between Zizi, his agents, and Michael and his agents.

## XI.     DEFAULT.

In the event either partys' actions or inactions in any manner are in derogation of the terms of this agreement, that party shall be in default of this agreement. In the event of a default, the non-defaulting party must through its' attorney and within 15 days via certified mail, communicate such default to the defaulting party and demand that cure be made within 10 days'. In the event the cure cannot be accomplished within ten days, the allowable cure time cannot exceed 15 days. Within 10 days, the defaulting party shall communicate, via its' attorney and by certified mail, that the default has been satisfied.

XII. **BREACH.** If the Defaulting party fails to send a certified letter indicating that default has been cured within 10 days, the defaulting party shall be in breach of this agreement. In the event of breach, the parties understand and agree that irreparable injury would be caused to the parties by failure to timely comply with the terms of this Agreement; that in the event of any breach of any of the provisions in this Agreement, the party or parties who are aggrieved thereby agree that the appropriate and fair remedy shall be to have the right to specific performance and/or an injunction, as well as monetary damages and any other appropriate relief in law or in equity which may be granted by any court in the United States of America; and that all such rights and remedies shall be cumulative and exclusive.

XIII. **FORFEITURE.** In the event of breach of any of the provisions in this Agreement, and in addition to the relief available pursuant to paragraph 13, the breaching party agrees and understands that it shall immediately forfeit 25% of its' stake in Green Group until a judicial determination is made that the breaching party did not commit a breach. Signed contemporaneously with this agreement, both parties shall also sign a resolution transferring 25% of their stake in Green Group to the other, thereby this interest being suspended while in escrow. Zizis' resolution document shall be held in Zizi's attorneys' escrow account and shall be immediately transferred thereto upon a judicial determination that the he is in fact in breach. Michaels' resolution document shall be held in Michaels' attorneys' escrow account and shall be immediately transferred thereto upon a judicial determination that the he is in fact in breach. In the event there is a judicial determination that the breaching party did breach this agreement for any reason, the breaching party shall forfeit 25% of its' stake in Green Group permanently.

XIV. **ATTORNEY FEES.** The breaching party shall pay the non-breaching party's reasonable attorneys' fees.

XV.    **MISCELLANEOUS**

12.1   Any and all notices or other communications which may be sent to any Member shall be sent to the address noted in Schedule A, unless the Company is notified in writing with regard to a change of address. Notices or other communications shall be deemed to have been given only when deposited with the United States Postal Service by registered or certified mail, return receipt requested, addressed as set forth above.

12.2   This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

12.3   This Agreement may be executed in multiple parts, each of which shall be deemed an original and all of which together shall constitute one agreement, by each of the parties hereto on the dates indicated in the acknowledgment of said parties, notwithstanding that all of the parties are not signatories to the same part or that signature pages from different parts are combined. The signature of any party to any part shall be deemed to be a signature to and may be appended to any

other part.

12.4 Words of gender used in this Agreement shall be interpreted to include the other gender, and words in the singular number shall be interpreted to include the plural (and vice-versa), when the sense so requires. The captions to each Article are inserted only as a matter of convenience and for reference purposes and in no way define, limit or describe the scope or intent of this Agreement, nor in any way affect it.

12.5 This Agreement contains the entire understanding between the parties and supersedes any prior understandings and agreements between them concerning the within subject matter. There are no representations, agreements, arrangements or understandings, oral or written, between the parties hereto relating to the subject matter of this Agreement which are not described herein.

12.6 This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdictions in which the Company does business. If any provision of this Agreement or its application to any person or circumstance shall, for any reason and to any extent, be found to be invalid or unenforceable, the remainder of this Agreement or the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

12.7 The word "person", as used in this Agreement, shall include a corporation, firm, partnership or other form of association. "Bankruptcy", as used in this Agreement, shall be deemed to occur when a Member files a petition in bankruptcy or voluntarily takes advantage of any bankruptcy or insolvency laws, or is adjudicated a bankrupt, or when a petition or answer is filed proposing the adjudication of a Member as a bankrupt and such Member either consents to the filing or such complaint or answer is not discharged or denied prior to the expiration of sixty (60) days following the date of filing.

12.8 This Agreement, and all the terms and provisions hereof, shall be binding upon and shall inure to the benefit of all Members and their respective legal representatives, heirs, permitted successors and permitted assigns.

**IN WITNESS WHEREOF,** the Members have entered into this Agreement and have hereunto set their hands to multiple copies hereof, as of the effective date first written above.

**MEMBERS:**

Michael Kandhorov

Charles Zizi

**EXHIBIT A**

| MANAGER | EQUITY INTEREST |
|---|---|
| 1. Michael Kandhorov | 60% |

| MEMBER | EQUITY INTEREST |
|---|---|
| 2. Charles Zizi | 40% |